| | | |
|---|---|---|
| **TABITHA MARIE SMITH (Deceased)** | : | |
| **(aka Tabatha Marie Colbaugh), by and** | : | |
| **through her surviving children** | : | |
| **NATHAN ALEXANDER SMITH,** | : | **No. 1:24-cv-151-DCLC-CHS** |
| **JE through next friend JH,** | : | |
| **NR through next friend SR, and** | : | |
| **LC through next friend EH,** | : | |
| | : | **JURY DEMANDED** |
| **and** | : | |
| | : | |
| **NATHAN ALEXANDER SMITH,** | : | |
| **JE through next friend JH,** | : | |
| **NR through next friend SR, and** | : | |
| **LC through next friend EH, (individually),** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MEIGS COUNTY, and** | : | |
| | : | |
| **ESTATE OF ROBERT J. LEONARD** | : | |
| **(Deceased), by and through Neal Pinkston** | : | |
| **as Administrator *ad Litem*,** | : | |
| | : | |
| **Defendants.** | : | |

## MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT BY DEFENDANT MEIGS COUNTY

COMES NOW Defendant MEIGS COUNTY, ("MEIGS"), through counsel, and pursuant to Federal Rule of Civil Procedure 8 & 12, and files its Motion to Dismiss Plaintiffs' Third Amended Complaint and would state as follows:

### Applicable Standard for Motion to Dismiss

1)      Pursuant to Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

1

2)      In turn, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Plaintiffs' Complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

3)      When considering a Rule 12(b)(6) motion to dismiss, a court must treat all of the well pleaded allegations of the complaint as true and construe all of the allegations in the light most favorable to the plaintiff. *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005). "Dismissal of the complaint is proper 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003). The Court is not required, however, to "accept as true legal conclusions or unwarranted factual inferences." *Bovee v. Coopers Lybrand, C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (internal quotation marks and citation omitted).

## **BRIEF FACTS**

The instant lawsuit involves alleged 42 U.S.C. §1983 and §1988 civil rights claims and state law claims that sound in theories of tort including wrongful death, intentional infliction of emotional distress, common law assault and battery, gross negligence, and loss of consortium. (See DOC 67, Complaint, at Counts One - Eight).

The Complaint alleges:

- that MEIGS is a political subdivision of the State of Tennessee. (DOC 67 at ¶¶7 and 13);

- that MEIGS at all times relevant employed the individual Defendant Officer Leonard. (DOC 67 at ¶¶19, 38 and 120);

- that Officer Leonard acted under the color of his office and under the color of law. (DOC 67 at ¶¶ 20, 74, 86, 96, 100 and 104);

In the instant motion, MEIGS requests the following:

2

- the Court dismiss all claims against MEIGS under 42 U.S.C. §1983 and §1988 because Plaintiffs' claims sound in common law negligence theories that do not rise to Constitutional violations;

- the Court dismiss all state-law claims; and

- the Court dismiss the punitive damages claim against MEIGS;

The instant memorandum of law follows.

## MEMORANDUM OF LAW

### A.  Count One – Violation of Civil Rights under Color of Law – Deprivation of 14th Amendment's Protection of Liberty Interest and Bodily Integrity

Plaintiffs attempt to state a claim under the Fourteenth Amendment to the Constitution of the United States for a deprivation of Decedent's liberty interest and bodily integrity.  (DOC 67 at ¶¶63-74.)  To support such claims, Plaintiffs make several allegations against Defendant Leonard including that he engaged in criminal acts (DOC 67 at ¶66), he chose to ignore rumble strips and signage (DOC 67 at ¶67), he drove at excessive speed (DOC 67 at ¶¶66 and 68), that no reasonable person could mistake Blythe Ferry Lane for Hiawassee Highway (sic) (DOC 67 at ¶69), and he could not navigate the route from the arrest scene to the police department (DOC 67 at ¶70).  These allegations against Defendant Leonard are followed by a general claim that all of Defendant Leonard's alleged transgressions were as a result of MEIGS' failure to train him in various ways. (DOC 67 at ¶72.)  Plaintiffs make such "failure to train" allegations against MEIGS throughout their Complaint. (DOC 67 at ¶¶52, 55, 56, 57, 58, 70, 72, 84, 85 and 105.)  To avoid repetitive pleading, MEIGS will address all such "failure to train" allegations here and refer to this section hereinbelow as necessary.

### 1.  Failure to Train

As an initial matter, governmental immunity is retained where injuries arise out of "[t]he exercise or performance or the failure to exercise or perform a discretionary function, whether or

not the discretion is abused. Tenn. Code Ann. §29-20-205(1) (emphasis added). In the instant case, the Plaintiffs' Complaint alleges negligent supervision and training by MEIGS. Tennessee District Courts have consistently held that the screening, hiring, training, and supervision of officers "clearly" falls within the discretionary exception. See *Peatross v. City of Memphis*, 2015 WL 13021901 at *8 (W.D. Tenn. Mar. 12, 2015), aff'd, 818 F.3d 233 (6th Cir. 2016). See also *Savage v. City of Memphis*, 620 F. App'x. 425, 429 (6th Cir. 2015) (finding that "the sorts of determinations the [Memphis Police Department] must make in how it trains and supervises its employees, staffs its departments, and investigates the alleged wrongdoing of its employees place the Plaintiffs' direct-negligence claims squarely within the discretionary-function exception"). As such, the discretionary acts exception to waiver on immunity warrants dismissal of the Plaintiffs' "failure to train" claims against MEIGS

Next, the United States Supreme Court has limited what claims regarding inadequate training by a governmental entity are actionable as a constitutional violation, stating as follows:

> **We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition in** *Monell*, 436 U.S., at 694, 98 S.Ct., at 2037, and *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), **that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.** As Justice BRENNAN's opinion in *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300-1301, 89 L.Ed.2d 452 (1986) (plurality) put it: **"[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers.** See also *Oklahoma City v. Tuttle*, 471 U.S., at 823, 105 S.Ct., at 2436 (opinion of REHNQUIST, J.). **Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.**

4

*Monell's* rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. **The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."** It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. See *Springfield v. Kibbe*, 480 U.S., at 268, 107 S.Ct., at 1120 (O'CONNOR, J., dissenting); *Oklahoma City v. Tuttle*, supra, 471 U.S., at 821, 105 S.Ct., at 2435 (opinion of REHNQUIST, J.). It may be, for example, that an otherwise sound program has occasionally been negligently administered. **Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.** Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. **And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.**

Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

>       To adopt lesser standards of fault and causation would open
> municipalities to unprecedented liability under § 1983.
>
>       In virtually every instance where a person has had his or her
> constitutional rights violated by a city employee, a § 1983 plaintiff will be
> able to point to something the city "could have done" to prevent the
> unfortunate incident. See *Oklahoma City v. Tuttle*, 471 U.S., at 823, 105 S.Ct.
> at 2436 (opinion of REHNQUIST, J.). Thus, permitting cases against cities
> for their "failure to train" employees to go forward under § 1983 on a lesser
> standard of fault would result in de facto *respondeat superior* liability on
> municipalities—a result we rejected in *Monell*, 436 U.S., at 693-694, 98 S.Ct.,
> at 2037. It would also engage the federal courts in an endless exercise of second-
> guessing municipal employ e-training programs. This is an exercise we believe
> the federal courts are ill suited to undertake, as well as one that would implicate
> serious questions of federalism. Cf. *Rizzo v. Goode*, 423 U.S. 362, 378-380, 96
> S.Ct. 598, 607-608, 46 L.Ed.2d 561 (1976).
>
>       Consequently, while claims such as respondent's—alleging that the
> city's failure to provide training to municipal employees resulted in the
> constitutional deprivation she suffered—are cognizable under § 1983, they
> can only yield liability against a municipality where that city's failure to train
> reflects deliberate indifference to the constitutional rights of its inhabitants.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-393, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)
(Emphasis added.)

The Sixth Circuit has also commented on a governmental entity's potential liability for

failure to train its employees, stating as follows:

>       Because "[a] municipality's culpability for a deprivation of rights is at its
> most tenuous where a claim turns on a failure to train," "[a] pattern of
> similar constitutional violations by untrained employees is ordinarily
> necessary to demonstrate deliberate indifference." *Connick v. Thompson*, 131
> S. Ct. 1350, 1359-60 (2011) (internal quotation marks and citation omitted); see
> also *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). *Siler v. Webber*, No. 09-
> 6115 (6th Cir. Aug 22, 2011) (Emphasis added.)

In this case, the Plaintiffs do not allege that there has been "[a] pattern of similar

constitutional violations by untrained employees" by MEIGS' as is required for a "failure to

train" claim to survive a Motion to Dismiss.  As such, the Plaintiffs' claims under Count One

based upon MEIGS alleged failure to train (and throughout the Third Amended Complaint) are facially deficient and should be dismissed as a matter of law.

Returning to Plaintiffs' underlying claims of deprivation of a "Liberty Interest" and "Bodily Integrity," the Sixth Circuit Court of Appeals, citing the United States Supreme Court, speaking to "Liberty Interest" and "Bodily Integrity" claims has stated as follows:

> The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended." *Collins*, 503 U.S. at 125. Substantive Due Process is not "a rigid conception, nor does it offer recourse for every wrongful action taken by the government." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 862 (6th Cir. 2012)**. As such, it "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels***, 474 U.S. **at 332. That means a "'careful description' of the asserted fundamental liberty interest" is essential, *Glucksberg*, 521 U.S. at 721 (citation omitted), otherwise the Clause would turn into "a font of tort law to be superimposed upon whatever systems may already be administered by the States."** *Daniels*, 474 U.S. at 332 (citation omitted)

*Guertin v. Michigan*, 912 F.3d 907, 918 (6th Cir. Jan 04, 2019) (Emphasis added.)

The *Guertin* Court continued, stating as follows:

> Bodily integrity cases "usually arise in the context of government-imposed punishment or physical restraint," but that is far from a categorical rule. Kallstrom, 136 F.3d at 1062 (collecting cases). Instead, the central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body. See, e.g.
> *Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 269-70 (1990)
>
> . . .
>
> A few examples illustrate the breadth of this tenet. Consider *Washington v. Harper*, which addressed the State of Washington's involuntary administration of antipsychotic medication to an inmate without a judicial hearing. 494 U.S. 210, 213-17 (1990). There, the Supreme Court had "no doubt" that the inmate "possess[ed] a significant liberty interest in avoiding unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Id. at 221-22. This "interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial. The forcible injection of medication into a

7

nonconsenting person's body represents a substantial interference with that person's liberty." Id. at 229 (citing *Winston v. Lee*, 470 U.S. 753 (1985), and Schmerber, 384 U.S. 757). And this is especially so when the foreign substance "can have serious, even fatal, side effects" despite some therapeutic benefits. Id. But the extent of this interference, reasoned the Court, is circumscribed by the government's interest (there, administering medication in the custodial setting). Id. at 222-27. Examining those interests, the Court permitted the physical intrusion upon a showing of certain circumstances—danger to self or others, and in the inmate's medical interest. Id. at 227; see also *Riggins v. Nevada*, 504 U.S. 127, 135-38 (1992) (applying *Harper* to the forced administration of drugs in trial and pretrial settings and focusing upon the state's "overriding justification and a determination of medical appropriateness" to justify the intrusion); *Sell v. United States*, 539 U.S. 166, 177-86 (2003) (similar).

The Supreme Court's seminal "right to die" case, *Cruzan v. Director, Missouri Department of Health*, provides further explication. At issue in *Cruzan* was whether the parents of an individual in a persistent vegetative state could insist that a hospital withdraw life-sustaining care based on her right to bodily integrity. 497 U.S. at 265-69. Writing for the Court, Chief Justice Rehnquist extensively detailed the line between the common law, informed consent, and the right to bodily integrity: "This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment," id. at 269, "generally encompass[es] the right of a competent individual to refuse medical treatment," id. at 277, and is a right that "may be inferred from [the Court's] prior decisions." Id. at 278-79 (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Breithaupt v. Abram*, 352 U.S. 432 (1957); *Harper*, 494 U.S. 210; *Vitek v. Jones*, 445 U.S. 480 (1980); and *Parham v. J.R.*, 442 U.S. 584 (1979)). And, although the Court assumed as much, "the logic of [these] cases . . . embrace[s] . . . a liberty interest" in "artificially delivered food and water essential to life." Id. at 279. As with *Harper*, the Court's main inquiry was not whether the case dealt with the right to bodily integrity, but rather how to balance this right with a competing state interest (the protection of life) in relation to the procedural protections provided (the state's requirement that an incompetent person's wishes to withdraw treatment be proven by clear and convincing evidence). Id. at 280-87; cf. *Winston*, 470 U.S. at 759 (holding that a non-consensual "surgical intrusion into an individual's body for evidence" without a compelling state need is unreasonable).

This nonconsensual intrusion vis-à-vis government interest line of cases has played out time and time again in the lower courts. See, e.g., *United States v. Brandon*, 158 F.3d 947, 953 (6th Cir. 1998) ("[T]he issue of forced medication implicates . . . [the] liberty interest in being free from bodily intrusion."). The numerous cases involving government experiments on unknowing and unwilling patients provide a strong analogy to the Flint Water Crisis. Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding

the nature of the interference—is a classic example of invading the core of the bodily integrity protection.

*In re Cincinnati Radiation Litigation* is a good example. Funded by the Department of Defense, government officials at the University of Cincinnati subjected cancer patients to radiation doses consistent with those expected to be inflicted upon military personnel during a nuclear war. 874 F. Supp. at 802-04. The patients were in "reasonably good clinical condition," and were "primarily indigent, poorly educated, and of lower than average intelligence." Id. at 803. At no time did the government actors disclose the risks associated with the massive radiation doses or obtain consent to irradiate the patients at those levels for those purposes—they instead told the patients that the radiation was treatment for their cancer. *Id*. at 803-04. Summarizing the caselaw just mentioned, the *Cincinnati Radiation* court easily concluded that "[t]he right to be free of state-sponsored invasion of a person's bodily integrity is protected by the Fourteenth Amendment guarantee of due process." *Id*. at 810-11. The involuntary and misleading nature of the intrusions was key. The patients could not "be said to exercise that degree of free will that is essential to the notion of voluntariness" because:

> [t]he choice Plaintiffs would have been forced to make was one of life or death. If the Constitution protects personal autonomy in making certain types of important decisions, the decision whether to participate in the Human Radiation Experiments was one that each individual Plaintiff was entitled to make freely and with full knowledge of the purpose and attendant circumstances involved. Without actually seizing the Plaintiffs and forcing them to submit to these experiments, the . . . agents of the state[] accomplished the same feat through canard and deception[.] Id. at 812 (internal quotation marks and citations omitted). Also key was the risk of harm—the plaintiffs received "total and partial body radiation, which caused burns, vomiting, diarrhea and bone marrow failure, and resulted in death or severe shortening of life." *Id*. at 814.

We find the *Cincinnati Radiation* matter especially analogous. In both instances, individuals engaged in voluntary actions that they believed would sustain life, and instead received substances detrimental to their health. In both instances, government officials engaged in conduct designed to deceive the scope of the bodily invasion. And in both instances, grievous harm occurred. Based on the facts and principles set forth in the above cases, we therefore agree with the district court that "a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit."

Finally, we note what plaintiffs' claim does not entail. There is, of course, "'no fundamental right to water service.'" *In re City of Detroit*, 841 F.3d 684, 700 (6th Cir. 2016) (quoting *Golden v. City of Columbus*, 404 F.3d 950, 960 (6th Cir.

2005)). Moreover, the Constitution does not guarantee a right to live in a contaminant-free, healthy environment. See, e.g., *Lake v. City of Southgate*, 2017 WL 767879, at *4 (E.D. Mich. Feb. 28, 2017) (collecting cases). To this end, several defendants and the dissent cite a California state case involving residents complaining about a city fluoridating its drinking water supply. See *Coshow v. City of Escondido*, 132 Cal. App. 4th 687, 709 (2005). However, *Coshow* is particularly inapposite because it shows the push-and-pulls of competing policy decisions that generally fall outside the scope of a violation of the right to bodily integrity—there, the government publicly introduced fluoride into the water system, a chemical frequently added to public water systems to prevent tooth decay. Here, defendants make no contention that causing lead to enter Flint's drinking water was for the public good or that they provided notice to Flint residents about the lead-laced water. Therefore, "Coshow did not address whether substantive due-process protections might be implicated in the case of intentional introduction of known contaminants by governmental officials, and its reasoning is inapplicable here." *Mays*, 916 N.W.2d at 262 n.16.

B.

Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant. See *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011) ("[A] plaintiff must demonstrate a deprivation of a constitutionally protected liberty or property interest in order to establish a due process violation based on discretionary conduct of government officials[.]"). We use the "shocks the conscience" rubric to evaluate intrusions into a person's right to bodily integrity. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996). Thus, a "plaintiff must show as a predicate the deprivation of a liberty or property interest" and conscience-shocking conduct. See *EJS Props*., 698 F.3d at 861; *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (holding that conscience-shocking behavior must be taken "towards the plaintiff's federally protected rights"); see also *Vargas v. City of Phila*., 783 F.3d 962, 973 (3d Cir. 2015) ("To sustain a substantive due process claim, a plaintiff must show that the particular interest in question is protected by the Fourteenth Amendment and that the government's deprivation of that interest 'shocks the conscience.'"); *United States v. Sanders*, 452 F.3d 572, 577 n.4 (6th Cir. 2006) (similar); *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) (similar).

"[T]he measure of what is conscience shocking is no calibrated yard stick," nor is it "subject to mechanical application." *Lewis*, 523 U.S. at 847, 850. Several "tropes" help explain its meaning, *Range*, 763 F.3d at 589, with the focus again being on "executive abuse of power." *Lewis*, 523 U.S. at 846. *Rochin* is the "benchmark." Id. at 846-47. Due-process-violative conduct (there, forced stomach pumping to extract evidence) "shocks the conscience," infringes upon the "decencies of civilized conduct," is "so brutal and so offensive to human dignity," and interferes with rights "implicit in the concept of ordered liberty." Rochin, 342 U.S. at 169, 172-74 (citation omitted); see also *Lewis*, 523 U.S. at 846-47

10

(collecting authorities). "**These are subjective standards, to be sure, but they make clear that the 'shocks the conscience' standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation."** *Range*, 763 F.3d at 590. **Stated differently, the shocks-the-conscience test is the way in which courts prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees.**

To aid this inquiry, we are to place the alleged heinous conduct on a spectrum, "[t]he bookends [of which] present the easier cases." *Id*. **On the one end is conduct that "is categorically beneath the threshold of constitutional due process,"** mere negligence. *Lewis*, 523 U.S. at 849. Conduct that is "intended to injure in some way unjustifiable by any government interest" represents the other end, for this behavior "would most probably support a substantive due process claim." *Id*. We deal here not with these extremes, but rather in the middle, what the Court has deemed "something more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Id*. (internal quotation marks omitted).

This "middle state of culpability 'may or may not be shocking depending on the context,'" *Range*, 763 F.3d at 590 (quoting *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008)), for what may "constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial," *Lewis*, 523 U.S. at 850 (quoting *Betts v. Brady*, 316 U.S. 455, 462 (1942)). "*Deliberate indifference* that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Id.

*Lewis* delineates this dichotomy. The issue there was "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Id*. at 836. The Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment . . . ." *Id*. at 854. In so holding, the Court highlighted how the time to deliberate in one circumstance may dictate liability in one situation but not another because "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical[.]" *Id*. at 851. Take a classic deliberate indifference situation—when, for example, a prison official has "time to make unhurried judgments, [with] the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id*. at 853. It is in these kinds of situations where we would expect plaintiffs asserting substantive due process claims based on deliberate indifference to be most successful. In

rapidly evolving situations like prison riots, high-speed chases, and other tense, split-second-reaction-demanding matters, we apply "a much higher standard." *Id.* at 852-54. **We look instead to whether the state actor applies force "maliciously and sadistically for the very purpose of causing harm"—in other words, whether he acted with an intent to harm.** Id. at 853.

*Guertin v. Michigan*, 912 F.3d 907, 919-924 (6th Cir. Jan 04, 2019) 6th Cir. Jan 04, 2019)

The facts pled in this case do not reveal the type of interaction between Defendant Leonard and Decedent necessary to support claims for a violation of the Fourteenth Amendment of the Constitution for deprivation of Decedent's Liberty Interest or Bodily Integrity, and much less so for MEIGS. Further, the allegations do not show any intent on the part of either Leonard or MEIGS as required by law, and, while surely tragic, the actions pled do not rise to the level to be "shocking to the conscious." For these reasons, the Plaintiffs' claim contained in Count One of the Complaint is facially deficient and should be dismissed as a matter of law.

The Plaintiffs further allege that Defendant Leonard violated the Fourteenth Amendment because a "special relationship" was created with the Deceased, stating, "The instant Leonard arrested the Deceased and placed her handcuffed in the back of his patrol car, a special relationship existed between the Deceased, Leonard and the County. Once in the custody of the Defendants, the deceased was completely reliant upon the Defendants to ensure that she would not be injured or killed." (DOC 67 at ¶¶64-65.) The above cases make it clear that the fact pattern in this case does not rise to the level required by Federal law to impose liability for a violation of a constitutional right. The Sixth Circuit recently summarized the analysis for determining whether a state actor's conduct violates the Fourteenth Amendment in such a situation, stating as follows:

> [T]he plaintiff **"must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment."** The government's conduct must be "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense,'" but the standard is

"'no calibrated yard stick.'" **"The guiding principle seems to be that a deliberate-indifference standard is appropriate in 'settings that provide the opportunity for reflection and unhurried judgments,' but that a higher bar may be necessary when opportunities for reasoned deliberation are not present."** *McQueen*, **433 F.3d at 469** (internal citations omitted); *see also Ewolski*, 287 F.3d at 510. In other words, the circumstances presented in the individual case determine whether the defendant's conduct violated the Fourteenth Amendment. **In circumstances "when unforeseen [**12] circumstances demand an officer's instant judgment," such as a high-speed police chase, "a Fourteenth Amendment violation occurs only when the police act with malice and an 'intent to harm.'"** *Ewolski*, 287 F.3d at 511 (citing *Lewis*, 523 U.S. at 853-54, 118 S. Ct. at 1720 (internal citations omitted)). **In comparison, where "actual deliberation is practical," such as in the custodial situation of a prison, a less deferential "deliberate indifference" standard applies.** *Lewis*, **523 U.S. at 851, 118 S. Ct. at 1719.**

The parties disagree as to which standard applies in the instant case. Defendants argue that the situation presented did not provide the officers time for reflection and that, therefore, the more deferential "intent to harm" standard applies. (Defs.' Br. at 6.) Mr. Rusu contends that in all custodial situations, such as his case, the less deferential "deliberate indifference" standard applies. (Pl.'s Resp. at 7 (citing *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997).)

As Defendants correctly point out, *Stemler* was decided before the *Lewis* Court clarified that the circumstances presented dictate which standard to apply to evaluate the state actor's conduct. Thus the Court [**13] does not believe that the deliberate indifference standard always applies in custodial situations. **The Court further believes that the incident with which the [*838] officers were presented on June 3, 2005, more closely resembles those situations in which officers are faced with "unforseen circumstances" that demand "instant judgment."** *Lewis*, **523 U.S. at 853, 118 S. Ct. at 1720. Mr. Rusu therefore must show that the officers acted with malice and an intent to harm him when they did not arrest Mr. Salmo and walked Mr. Rusu, while he was handcuffed, within Mr. Salmo's proximity.** *Ewolski*, 287 F.3d at 511 (citing *Lewis*, 523 U.S. at 853-54, 118 S. Ct. at 1720). Even accepting Mr. Rusu's version of the events as true, the Court concludes, as a matter of law, that this conduct did not violate Mr. Rusu's constitutional rights. The officers' actions evidence neither malice nor an intent to harm Mr. Rusu. Even applying the less deferential "deliberate indifference" standard, however, the Court does not find the officers' actions "conscience shocking."

*Rusu v. City of Birmingham*, 522 F. Supp. 2d 833, 837-838. (Emphasis added.)

In this case, the conduct by Officer Leonard was simply taking the Decedent into custody and

attempting to drive her to the police station, which ended tragically with Officer Leonard driving

13

his patrol car into the Tennessee River. Such conduct does not demonstrate the "malice or intent to harm" the Decedent necessary to create a violation of the Decedent's constitutional rights, and such claim fails as a matter of law. Thus, there is no support for such a claim against MEIGS, and such claims fail as a matter of law.

### B. Count Two - Failure to Protect

In Count Two of the Complaint, the Plaintiffs make a "failure to protect" claim against Defendant Leonard and Meigs County under the Fourteenth Amendment. (DOC 67 at ¶¶75-86.) As evidence regarding the alleged "failure to protect claim," Plaintiffs plead that "Leonard made a conscious decision to text whiling driving, drive at excessive speed, ignore adverse weather conditions, ignore the Deceased's warning, ignore rumble strips and ignore signage with the Deceased handcuffed in the back of his police cruiser." (DOC 67 at ¶78.)

The United States Sixth Circuit has set forth what a pretrial detainee such as the Decedent must plead under a "failure to protect" claim, stating as follows:

> Under our caselaw, a pretrial detainee bringing a failure-to-protect claim against an individual officer must satisfy a four-part test to show a violation of the Fourteenth Amendment. First, the detainee must plausibly allege that: (1) the officer "made an intentional decision with respect to the conditions under which the plaintiff was confined;" (2) "[t]hose conditions put the plaintiff at substantial risk of suffering serious harm;" (3) the officer failed to "take reasonable available measures to abate that risk;" and (4) by failing to take such measures, the officer "caused the plaintiff's injuries."

*Davis v. Chorak*, 2023 U.S. App. LEXIS 6133 at 6. (6th Cir. Mar 14, 2023)

In this case, in furtherance of their "failure to protect" claim, the Plaintiffs allege that Officer Leonard handcuffed Decedent and placed her in the backseat of his police vehicle, an event that occurs hundreds if not thousands of times per day in the United States. There was nothing inherently unsafe in this act. Certainly, handcuffing the Decedent and placing her in the back seat of a police cruiser did not place Decedent "at substantial risk of suffering serious harm." The

Plaintiffs next allege that Defendant Leonard made a conscious decision to engage in criminal acts, drive at excessive speed, and ignore rumble strips and signage with Mrs. Colbaugh handcuffed in the back of his police cruiser." (DOC 67 at ¶¶78.) The Plaintiffs then attempt to bootstrap those allegations against Defendant Leonard into constitutional violations by MEIGS by alleging improper training and supervision on the part of MEIGS. (DOC 67 at ¶85.) For Defendant's response regarding training, see Section (a)(1) above.

With regard to liability for improper supervision, Section 1983 does not provide for liability under the theory of respondeat superior. *Iqbal*, 556 U.S. at 676; *McQueen v. Beecher Cmty. Sch*., 433 F.3d 460, 470 (6th Cir. 2006) (citing *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003)). Negligence, too, is not a vehicle for § 1983 supervisory liability. *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 441 (6th Cir. 2002) (citation omitted). Supervisory liability cannot be based on inaction, but "must be based on [subordinates'] 'active unconstitutional behavior.'" Id. at 440 (discussing *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999)); see also *McQueen*, 433 F.3d at 470.

For liability to attach to a supervisor's **"failure to supervise, control or train the offending individual . . . the supervisor [must have] 'either encouraged the specific incident of misconduct or in some other way directly participated in it.**'" *Frodge v. City of Newport*, 501 F. App'x 519, 532 (6th Cir. 2012) (quoting *Shehee,* 199 F.3d at 300); see also *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010); *Petty*, 478 F.3d at 349; *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002); *City of Roseville*, 296 F.3d at 440. (Emphasis added.) "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (quoting *Hays v. Jefferson Cnty., Ky*., 668 F.2d 869,

874 (6th Cir. 1982)); see also *Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 634-35 (6th Cir. 2013). *Nissen v. Cnty. of Sumner*, Civil No. 3:13-0842 (M.D. Tenn. Jul 21, 2014) Plaintiffs make no such allegations, and thus, the Plaintiffs' allegations for improper supervision fall far short of that necessary to support a constitutional claim, and as such, cannot support a claim for "failure to protect."

Given the lack of allegations regarding "failure to protect" and improper supervision against MEIGS, and the inadequacy of the allegations against Defendant Leonard to support such a claim against MEIGS, such claims fail as a matter of law.

### C. Count Three – Wrongful Death

Federal courts, in general, may exercise jurisdiction over claims brought under 42 U.S.C. 1983, because they typically raise a federal question. Such is not the case in this case, however, as the Plaintiffs have asserted state-law claims based solely upon Tennessee law against MEIGS and Officer Leonard. MEIGS requests the Court consider whether it should exercise supplemental jurisdiction over the state-law claims, and elect not to exercise such supplemental jurisdiction.

Any tort claim against a Tennessee governmental entity *must* be brought pursuant to the Tennessee Government Tort Liability Act ("TGTLA"). *See* Tenn. Code Ann. §29-20-101 et seq. *See also Sneed v. City of Red Bank, Tenn.*, 459 S.W.3d 17, 24–25 (Tenn. 2014). The TGTLA provides that "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. §29-20-201. "Governmental entity" is defined as "any political subdivision of the state of Tennessee." Tenn. Code Ann. § 29-20-102(3)(A).

The TGTLA also provides "[t]he circuit courts [of Tennessee] have exclusive jurisdiction over any action brought under this chapter." Tenn. Code Ann. §29-30-307. As a result of this "exclusive jurisdiction" provision, federal district courts routinely refuse to exercise supplemental jurisdiction over state-law claims brought under the TGTLA. *See, e.g.*, *Durham v. Estate of Losleben by and through Tatum*, No. 16-1042, 2017 WL888357, at *5 (W.D. Tenn. Mar. 6, 2017) (collecting cases).

A court can decline to exercise supplemental jurisdiction "in exceptional circumstances [where] there are compelling reasons for declining jurisdiction." 28 U.S.C. §1367(c)(4). The Sixth Circuit has held that "the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts." *Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 446 (6th Cir. 2000), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001).[1]

MEIGS submits this unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction of the state-law claims herein.

Turning now to the allegations contained in Count Three, other than alleging failure to train on the part of MEIGS (previously addressed) Plaintiffs simply restate that MEIGS is not immune from such claims, and that Officer Leonard had a duty to protect the Deceased from injury and death, and that Leonard's acts were malicious, willful and criminal. Count Three of the Complaint does not state any allegations against MEIGS. While it is debatable under Tennessee's Public Duty Doctrine whether Leonard's acts were malicious, willful and criminal,

---

[1] There is some debate as to whether a federal court must dismiss a TGTLA claim, but even if the Sixth Circuit has not mandated dismissal, it has been clear "a federal district court should . . . decline to exercise jurisdiction over such claims." *Ontha v. Rutherford Cnty, Tenn.*, 222 F. App'x 498, 508 n.4 (6th Cir. 2007).

17

such claims do not create a claim against MEIGS, and such claims fail as a matter of law and must be dismissed.

The Plaintiffs' wrongful death claim (DOC 67 at ¶¶87-91) states no independent allegations against MEIGS and seems to be predicated upon "acts and omissions" stated otherwise in the Complaint. As such, this "claim" contains no independent allegations against MEIGS which are actionable, and to the extent such a claim be found, MEIGS incorporates all the defenses pled herein to such claim.

**D. Count Four – Assault and Battery**

In Count Four, the Plaintiffs limit their allegation to Officer Leonard and make no allegations against MEIGS in Count Four of their Complaint. (DOC 67 at ¶¶92-96.)

**E. Count Five - Intentional Infliction of Emotional Distress.**

The Plaintiffs make no allegations against MEIGS in Count Five of their Complaint. (DOC 67 at ¶¶97-100.) If this Court chooses to assume jurisdiction over this state law claim, TCA §29-20-205(2) provides:

> **Removal of immunity for injury caused by negligent act or omission of employees — Exceptions — Immunity for year 2000 computer calculation errors.**
>
> > Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:
> >
> > (1) The exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused;
> >
> > (2) False imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, **infliction of mental anguish**, invasion of right of privacy, or civil rights; . . .
> >
> > TCA §29-20-205(2) (2023). (emphasis added).

18

This provision specifically immunizes MEIGS against the Plaintiffs' claims of infliction of mental anguish. See *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1 (Tenn. 2021). As such, the Plaintiffs' claims for mental anguish in Count Five of the Complaint should be dismissed with prejudice

Further, in *Rogers v. Louisville Land Co.*, 367 S.W.3d 196 (Tenn. 2012), the Tennessee Supreme Court identified the elements of an IIED claim and stated in relevant part:

> The elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, **(2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff**.
>
> *Rogers*, 367 S.W.3d at 205 (emphasis added).

Turning now to the instant case, while the Complaint contains a conclusory allegation of "outrageous conduct" (DOC 67 at ¶98) **the Plaintiffs do not articulate facts reflecting what outrageous conduct occurred herein that is not tolerated by a civilized society**.

Moreover, Plaintiffs' Complaint contains no allegation whatsoever that the Plaintiffs suffered a **serious** mental injury herein. As such, the Colbaugh Plaintiff's IIED claim against MEIGS should be dismissed with prejudice.

### F. Count Six- Gross Negligence

In Count Six, the Plaintiffs allege that Officer Leonard was grossly negligent in his conduct. Plaintiffs then again state that the County failed to train Leonard, but in Count Six, Plaintiffs state that the County's failure to train is "gross negligence." MEIGS relies on the previous law discussed above regarding the "failure to train" issue.

Additionally, Federal Courts have previously considered such claims, stating as follows:

> The district court dismissed Mosier's state-law negligence claims under Federal Rule of Civil Procedure 12(b)(6). We review de novo a district court's order granting a motion to dismiss. *Health One Med. Ctr., Eastpointe P.L.L.C. v.*

19

*Mohawk, Inc.*, 889 F.3d 800, 801 (6th Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A.

The district court relied on the "civil-rights exception" to the Tennessee Governmental Tort Liability Act (GTLA) to dismiss Mosier's negligence claims against Evans in both his official and personal capacities and the vicarious liability claim against Crockett County. The court invoked the GTLA's "discretionary function exception" to dismiss the negligent hiring, training, retention, and supervision claim against Crockett County. The civil-rights exception bars all these claims, save for the personal-capacity claim against Evans.

**The GTLA recognizes that Tennessee "governmental entities" are broadly immune from state-law tort liability. See Tenn. Code Ann. § 29-20-201(a). This immunity extends to state-law tort claims against officials sued in their official capacities.** *Siler v. Scott*, 591 S.W.3d 84, 102 (Tenn. Ct. App. 2019) **("[W]here [the] GTLA immunizes a governmental entity, it follows that an officer is also immune when sued in his official capacity." (second alteration in original) (citation omitted)).** The GTLA then selectively waives that broad grant of immunity and creates exceptions to those waivers. As relevant here: **"Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of** . . . false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, **or civil rights."** Tenn. Code Ann. § 29-20-205(2) (emphasis added).

What does it mean to arise out of civil rights? The Tennessee Supreme Court has not answered the question, so we must predict what the Tennessee Supreme Court would say. See *Payne v. Novartis Pharmaceuticals Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). We have some relevant data to guide us.

**First, the Tennessee Supreme Court has been clear that the GTLA's waivers of immunity are to be "strictly construed" "in favor of the sovereign."** See *Lawson v. Hawkins County*, 661 S.W.3d 54, 60 (Tenn. 2023) (citations omitted). The GTLA "provides that 'any claim for damages must be brought in strict compliance with the terms of this chapter.'" *Hughes v. Metro. Gov't of Nashville &Davidson Cnty.*, 340 S.W.3d 352, 361 (Tenn. 2011) (quoting Tenn. Code Ann. § 29-20-201(c)). The Tennessee Supreme Court has read this language to say that a "strict constru[ction]" approach "has been expressly incorporated into the Act."[2] Id. (quoting *Ezell v. Cockrell*, 902 S.W.2d 394, 399 (Tenn. 1995)).

20

Next, we are guided by decisions of the Tennessee Court of Appeals, which are persuasive evidence of what the Tennessee Supreme Court would do. *Borman, LLC v. 18718 Borman, LLC*, 777 F.3d 816, 823 (6th Cir. 2015). Those decisions have construed the GTLA's civil rights exception and lead us to conclude that Mosier's claims "arise out of civil rights" under the GTLA.

Start with *Cochran v. Town of Jonesborough*, 586 S.W.3d 909 (Tenn. Ct. App. 2019). There, Cochran sued Officer Peace, who arrested him, and the Town of Jonesborough in federal court, alleging that he had been handcuffed too tightly. Id. at 911-12. Cochran brought both a Fourth Amendment excessive-force claim against Peace under § 1983, and a state-law negligence claim against the Town. Id. at 912. The negligence claims alleged that the Town had failed to train and supervise Peace and that the Town was vicariously liable for Peace's negligence in handcuffing Cochran. Id. The district court granted summary judgment to Peace on the excessive-force claim and declined to exercise supplemental jurisdiction over the negligence claims, dismissing them without prejudice. Id. Cochran then refiled the negligence claims in state court. Id. The state trial court dismissed the claims, reasoning that the GTLA's civil-rights exception applied because the claims arose "from the same set of facts upon which [Cochran] alleged that his constitutional and civil rights had been violated." Id. at 913. Cochran appealed.

The Tennessee Court of Appeals affirmed. **"As an initial matter," the court rejected the notion that a plaintiff could avoid the civil-rights exception simply by casting his claims as sounding in negligence**. Id. at 918. The "plaintiff's characterization of the claims in his complaint is not dispositive." Id. **The court then surveyed its prior cases, and concluded that in all but a single, unpublished, decision-*Parker v. Henderson County*, 2010 WL 377044 (Tenn. Ct. App. Feb. 4, 2010)-the Tennessee Court of Appeals had held that the civil-rights exception applied when civil-rights claims and negligence claims were "based on the same facts."** See id. at 915-921. Citing the Tennessee Supreme Court's "well-established principle that statutes permitting suits against the State must be strictly construed," the court rejected *Parker*, deciding instead "to follow the greater weight of authority and embrace the application of [the civil-rights exception] that preserves immunity." Id. at 920-21 (citations omitted). According to that construction, courts must look to the "gravamen" of the plaintiff's claim-"'the substantial point, the real purpose, or the object' of his action"-to determine whether it arises out of civil rights. Id. at 918-19 (quoting *Benz-Elliott v. Barrett Enters., LP,* 456 S.W.3d 140, 148 (Tenn. 2015)).

Applying that standard, the court held that Cochran's claims "sound[ed] squarely in civil rights." Id. at 919. The "premise" of Cochran's negligence action was that he had been "injured by the manner in which Officer Peace handcuffed and arrested" him. Id. Although Cochran cast those claims as sounding in

"negligence," see id. at 919 n.3, the essence of the allegations amounted to "excessive handcuffing," which, the court noted, is associated with the civil right to be free from excessive force under the Fourth Amendment, id. at 919. Thus, "regardless of how [Cochran] chose to characterize those claims in his state action," the state-law claims were covered by the civil-rights exception because they "stem[med] from" civil rights. Id.

Cochran protested that his claims could not have arisen out of civil rights; after all, the federal court had dismissed his § 1983 claim on the ground that Cochran's right to be free from excessive force had not been violated. Id. at 919, 920 n.4. The court of appeals was unmoved, noting that "[n]othing in the language" of the GTLA requires a finding that a civil-rights violation "occurred," only that the "injury" be one that "arises out of . . . civil rights." Id. at 920 (second alteration in original) (citation omitted). Because the alleged "underlying act of purported negligence" giving rise to Cochran's state law claims was "aggressive handcuffing," his claim arose out of civil rights, even though it was filed under the "guise of negligence." Id. at 920, 921 (citations omitted).

In *Siler v. Scott*, the Tennessee Court of Appeals again considered the question and reiterated its holding in *Cochran*. *Siler*, 591 S.W.3d at 97. There, Siler brought a federal civil-rights claim for excessive force against several officers, as well as a state-law negligence claim against Campbell County for its failure to supervise and train the officers. Id. at 92, 95. **The court of appeals held that Cochran "compelled" it to conclude that the civil-rights exception applied and barred the negligence claim. Id. at 97. That was so because, as in *Cochran*, Siler "alleged violation of his federal civil rights in his federal action" and "[a] claim of excessive force by law enforcement officers often involves the implication of a civil rights action." Id. Siler is the most recent published Tennessee Court of Appeals decision to address the question.**

*Cochran* and *Siler* hold that an injury arises out of civil rights when a civil-rights violation is the "gravamen" of the complaint. See *Cochran*, 586 S.W.3d at 918. The Tennessee Court of Appeals has explained that the plaintiff's "characterization of the claims" does not control; what matters is the claim's "substantial point" or "real purpose." Id. at 918-19 (citation omitted). And there need not have been an actual civil-rights violation. Id. at 920. Rather, Tennessee courts ask whether the claim is "based on the same facts" or is sufficiently related to an accepted civil-rights claim. See id. at 918-19.

**That standard is consistent with the approach we have taken in our prior cases.** In *Johnson v. City of Memphis*, Johnson brought a § 1983 claim and moved to amend her complaint to add a negligence claim. 617 F.3d 864, 867 (6th Cir. 2010). The § 1983 claim alleged that officers' entry into a home violated the Fourth Amendment. See id. at 868. The negligence claim alleged that a 911 dispatcher had failed to relay relevant information to those officers. See id. at 871. This court affirmed the district court's denial of the motion to amend under the

civil-rights exception because the "claim regarding the dispatcher's negligence arises out of the same circumstances giving rise to her civil rights claim under § 1983." Id. at 872. We reiterated that standard in *Devereux v. Knox County*, 15 F.4th 388 (6th Cir. 2021), and collected cases demonstrating that we continue to apply *Johnson's* "aris[ing] out of the same circumstances" analysis, as does the Tennessee Court of Appeals. Id. at 393. We added that, "under *Cochran*," the issue is whether negligence claims "sound in civil rights," and noted that the "presence of a civil rights claim is not strictly necessary" for the GTLA's civil-rights exception to bar a negligence claim. Id. at 397.

The dissent would disregard this uniform authority as a predictor of how the Tennessee Supreme Court would rule. That is because two unpublished opinions of the Tennessee Court of Appeals persuade the dissent that the Tennessee cases point "in conflicting directions." Dis. Op. at 25 (citing *Parker*, 2010 WL 377044 (Tenn. Ct. App. Feb. 4, 2010), and *Neely v. McDonald*, 2000 WL 1568387 (Tenn. Ct. App. Oct. 20, 2000)). But those two cases predate the published decision in *Cochran*; and *Cochran* resolved the conflict. In *Cochran*, the Tennessee Court of Appeals, expressly acknowledged a "conflict in how [it had] applied section 29-20-205(2) in the past." 586 S.W.3d at 916. The court then analyzed its caselaw in detail, concluding that, although it had "reached a different result in *Parker*," id., the "greater weight of authority" favored the "gravamen," "substantial point," or "real purpose" standard. Id. at 915-21. And "[k]eeping in mind" the Tennessee Supreme Court's admonition "that a strict construction approach to the GTLA 'has been expressly incorporated into the Act,'" the court decided to follow the majority approach "and embrace the application of section 29-20-205(2) that preserves immunity." Id at 921 (quoting *Hughes*, 340 S.W.3d at 361). Then, in *Siler*, the court held that the "lines of authority culminating most recently in *Cochran*" "compelled" it to do the same. *Siler*, 591 S.W.3d at 97.

As for our cases, the dissent finds "conflicting rulings" based on one forty-year-old federal district court case: *McKenna v. City of Memphis*, 544 F.Supp. 415 (W.D. Tenn. 1982), aff'd, 785 F.2d 560 (6th Cir. 1986). Dis. Op. at 25. But our opinion in *Johnson* adopted the "aris[ing] out of the same circumstances" standard after considering *McKenna*, based on the "results reached by the majority of district courts addressing this question." *Johnson*, 617 F.3d at 872. And we have consistently applied the *Johnson* standard thereafter. See, e.g., *Est. of Erwin by & through Erwin v. Greene County*, 861 Fed.Appx. 1, 8 (6th Cir. 2021); *Savage v. City of Memphis*, 620 Fed.Appx. 425, 430 (6th Cir. 2015); see also *Devereux*, 15 F.4th at 393.

**After *Cochran*, which abrogated cases like *Parker*, the decisions of the Tennessee Court of Appeals are uniform. See *Siler*, 591 S.W.3d at 97. That uniform approach is consistent with this court's interpretation of the civil-rights exception, see *Devereux*, 15 F.4th at 393, and the Tennessee Supreme Court's explicit instruction that waivers of sovereign immunity in the GTLA are to be construed narrowly, see *Lawson*, 661 S.W.3d at 60. That is**

23

**convincing evidence of what the Tennessee Supreme Court would do, and neither Mosier nor the dissent cite any good law to the contrary.**

**The standard announced in *Cochran*, and recognized by this court in cases like *Devereux*, bars Mosier's state-law negligence claims against Evans in his official capacity and against Crockett County.**

*Mosier v. Evans*, 904 F. 4th 541, 550-554, 6th Cir. Jan 09, 2024) (Emphasis added.)

The gravamen of the Plaintiffs' Complaint resides with their civil rights claims that they allege in Counts One and Two. As such, Plaintiffs' state law negligence claims alleged in Count Six are barred by the standard announced in *Cochran* and recognized by this court in cases like *Devereux*, and such claims fail as a matter of law and must be dismissed.

## G. Count Seven - Negligence

In Count Seven, the Plaintiffs allege that MEIGS was negligent in that it "failed to provide risk-appropriate warnings for drivers on the bridges and roads." (DOC 67 at ¶111.)

However, the Tennessee Supreme Court has determined that under Tenn. Code Ann. §29-20-205, MEIGS is immune from such negligence claims as decisions regarding what safety apparatus to employ on roads are a discretionary function, and governmental immunity for such decisions has not been waived. The Tennessee Supreme Court has stated as follows:

Although we have determined that the lack of guardrails was not a defective, unsafe, or dangerous condition so as to waive governmental tort immunity under §29-20-203(a), the nature of the plaintiff's allegations leads us to consider whether the decision not to install standard metal guardrails on Coward Mill Bridge was negligence under §29-20-205. Section 29-20-205 provides for a waiver of governmental immunity "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment." **However, immunity is not waived where the injury "[a]rises out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused."** Tenn. Code Ann. § 29-20-205(1). **Thus, the key is whether the decision not to install guardrails at this site was a discretionary function.**

We defined the "discretionary function" exception in *Bowers v. City of Chattanooga*, 826 S.W.2d 427 (Tenn.1992). In *Bowers*, we adopted the

24

"planning-operational test" to aid in determining whether a particular act was a discretionary function. Under this test, "decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability." 826 S.W.2d at 430. In contrast, decisions that are merely "operational" or implement prior planning decisions are not "discretionary functions" and may subject the government to tort liability. Id. at 430-31. "Planning" decisions are those "involving the formulation of basic policy characterized by official judgment, discretion, weighing of alternatives, and public policy choices." *Voit v. Allen County*, 634 N.E.2d 767, 769-70 (Ind. Ct. App.1994). **When deciding whether a particular decision is "planning" or "operational," the courts should keep in mind the purpose of the discretionary function exception, that is, to 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'"** *United States v. Gaubert*, 499 U.S. 315, 323, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)) (both cases discuss the discretionary function exception under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674 et seq.). Moreover, "courts must not intrude into realms of policy exceeding their institutional competence. The judicial branch lacks the fact-finding ability of the legislature, and the special expertise of the executive departments.... [T]he courts ... should not attempt to balance the detailed and competing elements of legislative or executive decisions." *Industrial Indemnity Co. v. Alaska*, 669 P.2d 561, 563 (Alaska 1983). The discretionary function exception covers acts involving an element of judgment or choice if they are based on considerations of public policy. *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). It is the nature of the conduct rather than the nature of the actor that governs whether the exception applies. *Gaubert*, 499 U.S. at 325, 111 S.Ct. at 1275. As we pointed out in *Bowers*,

> the underlying policy of governmental immunity is better served by examining (1) the decision-making process and (2) the propriety of judicial review of the resulting decision.

A consideration of the decision-making process, as well as the factors influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational. If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules.

On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or

25

policies. These operational acts, which often implement prior planning decisions, are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act. 826 S.W.2d at 431 (citations omitted).

Another factor that should be considered when deciding whether an act is a planning decision or merely operational is whether the decision is one that is properly reviewable by the courts.

**The discretionary function exception "recognizes that courts are ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision" and therefore allows the government to operate without undue interference by the courts.** See *Wainscott v. State*, 642 P.2d 1355, 1356 (Alaska 1982). Put succinctly:

> [T]he judiciary confines itself ... to adjudication of facts based on discernible objective standards of law. In the context of tort actions ... these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not [reasonableness] but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions. *Bowers*, 826 S.W.2d at 431 (quoting *Peavler v. Board of Commissioners*, 528 N.E.2d 40, 44-45 (Ind.1988)).

**As in *Kirby*, 892 S.W.2d at 408, we find that the decision-making process in this case included the weighing of economic factors: the cost of installing standard guardrails against the perceived benefits that would result therefrom. Decisions that include the allocation of limited resources among competing needs do not need interference from the courts, absent clear guidance from the legislature to the contrary.** Accord *Rothrock v. United States*, 62 F.3d 196, 199 (7th Cir.1995); Baum v. United States, 986 F.2d 716, 722 (4th Cir.1993). **In this case, the decision not to install guardrails was discretionary. The legislature has decided by adopting the discretionary function exception in our Governmental Tort Liability Act to preserve governmental immunity under these circumstances.**

IV

We conclude that the facts of this case do not support the Court of Appeals' conclusion that Coward Mill Bridge was defective, unsafe, or dangerous. Thus, the county's immunity from tort liability is preserved under Tenn. Code Ann. § 29-20-203(a). We conclude further that the decision not to install guardrails despite the recommendations of state inspectors falls within the discretionary function exception of the GTLA. The decision of the Court of Appeals is, therefore, reversed, and the trial court's order dismissing the case is, hereby, reinstated.

*Helton v. Knox County, Tenn.,* 922 S.W.2d 877, 885-887 (Tenn. 1996.)

As such, the Plaintiffs' negligence claims against MEIGS contained in Count Seven fail as a matter of law and must be dismissed.

### J. Count Eight – Loss of Consortium

Paragraphs 114-117 of the Complaint do not set forth any new allegations against MEIGS.

### K. Count Nine – Liability Pursuant to Tenn. Code Ann. §8-8-302

Defendant has already addressed Counts Three - Eight of the Complaint and set forth the reasons that each should be dismissed. Tenn. Code Ann. §8-8-302 does not create any independent or additional liability or grounds that need to be addressed here.

Plaintiffs' reliance upon the Tennessee Constitution, Article 1, §13 is misplaced. By its own terms, that section applies to persons "confined in jail."   See. TN Const Art I § 13.

### L) Punitive damage claims

The Complaint requests punitive damages against MEIGS. A punitive damage claim against a governmental entity is not viable under 42. U.S.C. §1983 and is subject to dismissal. See e.g., *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983."); *Alexander v. Beale St. Blues Co., Inc.*, 108 F. Supp. 2d 934, 950 (W.D. Tenn. 1999) ("Punitive damages are not recoverable from a municipality under §1983 or under the GTLA.") (citations omitted); and, *Tipton Cnty. Bd. of Educ. v. Dennis*, 561 S.W.2d 148 (Tenn. 1978).

As such, the punitive damage claim against MEIGS should be dismissed.[2]

---

[2] To the extent the Plaintiffs seek punitive damages for any alleged violation(s) of state law claims, punitive damages are not recoverable from either a governmental entity or its employees for said violations. See *Johnson v. Smith*, 621 S.W. 2d 570, 572 (Tenn. 1981).

## Conclusion

WHEREFORE, based on the above, MEIGS respectfully requests the Court dismiss all of the Plaintiffs' claims brought against it, with prejudice.[3]

### CERTIFICATE OF CONFERENCE OF THE PARTIES

As this pleading involves a Motion to Dismiss, the parties have conferred and cannot reach agreement as to whether the defects complained of in the Motion to Dismiss vis a vis MEIGS can be cured by a permissible amendment

Respectfully submitted,

**MICHEL AND WARD, P.C.**

By: /S/ Alix C. Michel
   **Alix C. Michel (BPR No. 024243)**
   **David J. Ward (BPR No. 013449)**
735 Broad Street, Suite 406
Chattanooga, Tennessee 37402
Telephone: 423.602.9521
Facsimile: 423.265.9524
*Attorneys for Defendant MEIGS*

This 5th day of February, 2025.

---

[3] Discovery as to the liability issues has not commenced in this matter. By filing this motion, this Defendant does not waive the right to assert any additional Federal and/or State law immunities, including qualified immunity, the public duty doctrine, and defenses under the Eleventh Amendment and/or other GTLA provisions, in future pleadings.